## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

BERNARD ALIMENTI,

     Plaintiff,

v.                                Case No: 5:20-cv-386-CEH-PRL

TOWN OF HOWEY-IN-THE-HILLS,
FLORIDA,

     Defendant.

_____

## **ORDER**

     This cause comes before the Court upon the Motion for Summary Judgment of Defendant Town of Howey-in-the-Hills, Florida (Doc. 89), Plaintiff Bernard Alimenti's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 92), and Defendant's Reply (Doc. 96).

     In this 42 U.S.C. § 1983 action, Plaintiff alleges that Defendant, his former town of residence, violated his First Amendment rights by restricting his ability to speak during town council meetings.  He further alleges Defendant retaliated against him for exercising his First Amendment Rights.

     Having considered the motion, the response, the reply, and the parties' Joint Stipulation of Material Facts, and being fully advised in their premises, the Court will grant Defendant's Motion for Summary Judgment.

## I.    FACTS[1]

Plaintiff Bernard Alimenti moved to the town of Howey-in-the-Hills in approximately June 2018. Doc. 93 at 2.  He began to express criticism of town officials in the same month, after a cement spill on his street was not promptly cleaned up. Doc. 92-2 ¶¶ 3-8.  He also clashed with the town's code enforcement officer about a neighbor's property. Docs. 89-4, 89-5.  Over time, Plaintiff became a vocal critic of officials regarding a variety of issues. *See* Doc. 92-2 ¶ 10.  In this regard, he joined an unofficial faction of residents who shared his views, such as town council member Matthew McGill, Marni Drabik, and Paula Perry. Docs. 92-3, 92-4, 92-5.  Targets of Plaintiff's criticism included Public Works Director John Ernest, Mayor David Nebel, Police Chief Herbert Thomas, and Town Code Enforcement Officer Lawrence Chester. Doc. 92-2.  Plaintiff frequently aired his concerns during public meetings of the town council, which met twice per month. *Id.* ¶ 10; Doc. 93 at 1.

Plaintiff moved out of Howey-in-the-Hills in July 2019. Doc. 93 at 2.  On August 20, 2020, he filed suit against the town. Doc. 1.  He and two other former citizens brought claims against Howey-in-the-Hills as well as several officials in their official and individual capacities. *Id.*  Plaintiff subsequently dismissed the claims against the town officials, and the Court granted Defendants' motion to sever. Docs.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Joint Stipulation of Material Facts (Doc. 93).  For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

20, 57, 44.  Now Plaintiff alone brings two causes of action against the town pursuant to 42 U.S.C. § 1983. Doc. 60.  He alleges that the town violated his First Amendment right to free speech by suppressing his ability to speak at town council meetings, and that it retaliated against him for exercising his First Amendment rights. *Id.*

## A. First Amendment Violations

Plaintiff first alleges that town officials restricted his ability to speak during town council meetings or otherwise failed to enforce meeting rules in an equitable manner.

### 1) *Town Council Meeting Rules*

Town council meetings' procedures were governed by town Resolution 2013-010. Doc. 93 at 2; Doc. 89-3.  The resolution provided members of the public with two opportunities to speak during meetings: the first to address the subject of an agenda item, and the second during a public participation and comment period of up to 30 minutes at the end of each meeting. *Id.* §§ 4(5), 5(1).  When addressing an agenda item during which the council was acting in a quasi-judicial capacity, speakers were limited to three minutes per person, although the presiding officer and council had discretion to extend the time allowed or give the speaker an opportunity for a three-minute rebuttal following another comment. *Id.* § 4(6).  The public comment period at the end of each meeting required citizens to sign up in advance so that the period could be split equally between those who signed up. *Id.* § 5(1), (2).  Although "in no case may a citizen speak longer than three minutes," the presiding officer "may permit additional time to a given speaker on a case by case basis." *Id.*

3

The resolution also provided that the presiding officer was responsible for preserving order and decorum at all meetings. *Id.* §§ 4(1), 6.  A speaker must be recognized before making a comment or asking a question; no two speakers could be acknowledged at once, nor could speakers and members of the audience engage in discussion. *Id.* §§ 4(5), 5(6).  Speakers were required to be courteous in their language and presentation, and could not use "profanity or cursing, aggressive or threatening behavior" or engage in "personal verbal attacks." *Id.* §§ 5(5), 6(2).  Public comments could not be directed to an individual rather than the council as a whole. *Id.* §§ 5(4), 6(2).

### 2)  *November 26, 2018 Meeting*

Matthew McGill attested that he "observed that the rules for citizens to speak at Council meetings were not being enforced consistently by Mayor Nebel or [subsequent Mayor Martha] MacFarlane." Doc. 92-3 ¶ 9.  He "personally witnessed [his] supporters and others critical of [the town] and Mayors Nebel and MacFarlane not being afforded the same time and opportunities to speak as those who were not critical" of them. *Id.* ¶ 10.  Plaintiff and his witnesses identified several meetings in which these actions occurred.

The first such meeting occurred on November 26, 2018. Doc. 92-2 ¶ 11. Plaintiff alleges that Mayor Nebel, while serving as the presiding officer, prevented him from speaking because of the three-minute time limit, even telling him to "sit down," even though other members of the public were permitted to speak for longer

than three minutes. *Id.*  According to the audio recording of the meeting,[2] Plaintiff made a brief comment during discussion of an agenda item about body cams. 11/26/18 at 51:10.  During the general public comment portion at the end of the meeting he spoke a second time. *Id.* at 1:14:53.  This comment was critical of the town and the councilmembers' actions, and he addressed portions of it to individual councilmembers.[3]  The comment lasted five minutes and ten seconds and was uninterrupted; Mayor Nebel thanked him for it after he was finished.  Two other citizens made critical comments next, including Plaintiff's wife. *Id.* at 1:20:50.  Plaintiff then attempted to speak again, Doc. 93 at 4, and Nebel stated, "You had yours, sir. You're limited to three minutes.  Go sit down." 11/26/18 at 1:25:25.  Nebel then informed the next speaker, Elwis Benson, who had made a comment during the body cam section, that he had used part of his time already but they would let him come back up. 11/26/18 at 1:25:43.  A female councilmember clarified, "not for this one." Benson spoke for less than three minutes during each of his comments and was not cut off.

---

[2] Howey-in-the-Hills' town council meetings are recorded.  The recordings of the meetings that occurred on October 8, 2018, November 26, 2018, December 10, 2018, February 25, 2019, and March 25, 2019 were provided by Defendant in support of its Motion for Summary Judgment. *See* Docs. 81, 87.  The recordings of the meetings that occurred on January 14, 2019, September 23, 2019, and October 14, 2019 were provided by Plaintiff in support of its Response in Opposition. *See* Docs. 97, 98, 99.  All recordings will be cited by meeting date and approximate time-stamp of the relevant portion.  Because no official transcripts are available, all quotations are approximate.

[3] The rule against addressing comments to individual councilmembers was not enforced in any meeting recording provided to the Court.

Three people, including Plaintiff and Benson, spoke twice during the November 26 meeting—once during the body cam discussion and once during the general comment session—but no one else attempted to speak twice during the general comment session.  No one was cut off or interrupted during their comment, whether or not they were speaking critically.  Matthew McGill, who had been elected to the council but had not yet taken office, addressed the council for more than ten minutes during the general comment session without being cut off; his comments included criticism of town or council actions.

Nebel's statements to Plaintiff and Benson were discussed at the meeting on December 10, 2018, at Benson's request. 12/10/18 at 1:35:34.  Benson objected to what he believed was a new rule restricting public comments to a total of three minutes per meeting, rather than three minutes per issue.  A female councilmember responded that they had not intended to impose such a rule and that any perception of it resulted from the councilors' confusion because they were new to their positions. The councilmembers agreed that members of the public could speak for up to three minutes for each agenda item in addition to three minutes during the general public comment session.[4]  They did not address whether someone could speak twice during a single comment session.  Plaintiff made a critical comment after this discussion that lasted for less than three minutes and was uninterrupted. *Id.* at 2:17:45.  No speaker was cut

---

[4] At the January 14, 2019 meeting, Mayor Nebel stated that he was formally changing the public comment policy so that there could be public comment on each agenda item before a vote occurred, in addition to a general comment session at the end. 1/14/19 at 0:02:00.  He did not refer to time limits or multiple comments within one session.

off or interrupted during the December 10 meeting, although at least one critical comment exceeded the three-minute limit.  No speaker attempted to speak more than once during the general comment session.

### 3) January 14, 2019 Meeting

Plaintiff also alleges that he was denied a full opportunity to speak at the meeting on January 14, 2019. Doc. 92 at 7.  Both Plaintiff and Matthew McGill explain in their declarations that Mayor Nebel interrupted Plaintiff several times during a comment that lasted only two minutes and 45 seconds, and that "when he attempted to speak again during the public comment portion, Mayor Nebel told him he had used up his three minutes, when in fact he had not and he had spoken for less than others had." Doc. 92-3 ¶ 11; Doc. 92-2 ¶ 16.

The meeting recording demonstrates that Plaintiff made two statements at the January 14, 2019 meeting.  The first was during the public comment session following an agenda item about raises for council members. 1/14/19 at A46:52.[5]  His comment began with a question to Mayor Nebel, which Nebel answered.  Plaintiff then continued, expressing criticism of council members.  Councilman Scott responded to a statement Plaintiff made to him, and a heated discussion between Scott, Plaintiff, and Nebel ensued, with audible audience reactions.  At the end of Plaintiff's comment, he said "That's it," and Nebel stated "Thank you very much." *Id.* at A50:15.  Plaintiff's first comment lasted about three minutes and 25 seconds.  Following the public

---

[5] The recording of the January 14, 2019 is split into four audio files, labeled (a) through (d). The four files do not appear to be a complete recording of the meeting.

comment period about the raises, Mayor Nebel stated, "I haven't been limiting people to their three minutes, which in the future I'm going to, I'm going to have a little stop clock, but I felt there was a lot of passion about this particular issue so I let it run." *Id.* at A58:30; *see* Doc. 92-2 at ¶ 17.  A number of speakers exceeded the three-minute limit both before and after Nebel's statement, *see id.* at ¶ 16, and no citizen was cut off during their comment.

Plaintiff made a second statement during the general comment portion at the end of the meeting. 1/14/19 at D01:23.  In a comment that lasted about one and a half minutes, he recounted an incident with a councilmember and asked for the council to vote that member out.  A discussion ensued between Plaintiff and the town attorney regarding the legality of that procedure.  Another member of the public then said, "Excuse me, Mr. Alimenti, you vacated the floor, would you please sit down? It's my turn." *Id.* at D03:17.  Plaintiff protested that he was responding to the attorney, who had spoken to him.  The speaker asked the Mayor if he could have the floor, and Nebel agreed.  After giving his name and address, the speaker responded to a statement Plaintiff had made that referred to him.  Plaintiff said, "Do you want me to address it?" The speaker responded, "In a moment."  At that point, Nebel stated "Not if he used up his three minutes he can't." *Id.* at D3:56.  The recording does not contain another audible attempt to speak by Plaintiff.  No one attempted to speak twice during the same comment session at the January 14 meeting.

### 4)  *Spring 2019 Meetings*

Members of the public were permitted to exceed the three-minute time limit during most of the 2019 town council meetings, including February 4, February 25, September 23, October 14, and November 19. Doc. 92-3 ¶¶ 11-20; Doc. 92-2 ¶¶ 18-21. At the February 25, 2019 meeting, one speaker commented critically about the police department during discussion of an agenda item; during the general comment session he made a second statement that exceeded three minutes. *See* 2/25/19 at 2:43:12.  No one attempted to speak twice during the same agenda item or the general comment session.  The only speaker who was stopped from speaking as long as they wanted at the February 25 meeting was George Brown, a reserve police officer whom the Plaintiff describes as a "close friend of Chief Thomas." *See* Doc. 92-2 ¶ 19.  Brown spoke supportively of the police department for longer than three minutes. 2/25/19 at 1:11:00.  Mayor Nebel stated, "Officer, you're running over time," and later tapped on the microphone and said "Officer, that's long enough, I appreciate your comments but I asked you to wrap it up." *Id.* at 1:13:45, 1:14:35.  Nebel then granted Brown's request to conclude with two more sentences.

At the March 25, 2019 meeting, Mayor Nebel loosely enforced the time limit for each speaker during discussion of a controversial proposal for a new housing development, even using a timer, but he allowed most to exceed the limit or finish their thought before stopping them.  3/25/19 at 2:07:30 – 2:54:30.

There was one example of someone attempting to speak twice during the same public comment session of the March 25 meeting.  A heated exchange occurred

between a citizen and Councilman McGill during the citizen's comment following discussion of a different agenda item. *Id.* at 58:15.  The citizen's wife made the next comment, which also prompted an argument with McGill.  The first citizen then attempted to speak in response to one of McGill's statements, at which point Mayor Nebel stated "I'm ending this conversation, because this is not going to be an open debate. … We're done on that issue." *Id.* at 1:00:10.

### 5) *Fall 2019 Meetings*

Plaintiff identified the September 23, 2019, meeting as one in which a resident was permitted to speak a second time during the same public comment session. Doc. 92-2 at ¶ 18.  Martha MacFarlane presided, having been unanimously elected mayor by the council at the beginning of the meeting.  During the general public comment session at the end of the meeting, one resident spoke for a little more than three minutes to address an anonymous letter that had been distributed containing vitriol against McGill and residents of a housing development called Venezia. 9/23/19 at 1:47:00 to 1:50:07.  She made a call for togetherness between Venezia residents, of which she was one, and the rest of the town.  Following an unrelated comment that lasted nearly six minutes, Mayor MacFarlane asked for a motion to adjourn the meeting.  The previous speaker then reapproached the microphone, saying "I failed to address something," and MacFarlane told her, "really fast, really fast." *Id.* at 1:57:08.  The speaker spoke for approximately one minute and the meeting concluded.  No member of the public was cut off from speaking at the September 23 meeting, and no one else attempted to speak more than once in a single comment session.

At the meeting on October 14, 2019, Mayor MacFarlane strictly enforced the three-minute limit during the public comment session. 10/14/19 at 1:54:10 *et seq.* She announced in advance that she would be doing so, used an audible timer, and gave speakers one-minute warnings. Further, she applied the limit irrespective of whether speakers were critical or supportive of the town, including to former mayor Chris Sears. *See id.* at 2:15:50. Many speakers were Venezia residents who were critical of the town and who had signed a petition to de-annex their development. On only two occasions MacFarlane allowed speakers to exceed three minutes. In the first, Marni Drabik began a critical comment by explaining that she had timed herself and would be 11 seconds over, and hoped they would give her a break. *Id.* at 2:00:11. The timer went off while she was speaking, but she was permitted to conclude her remarks. *Id.* at 2:03:30. The second was a woman described by Plaintiff as a friend of MacFarlane, Doc. 92-2 ¶ 20, who was announcing upcoming Boy Scouts and library programming. 10/14/19 at 2:21:25; *see* Doc. 92-2 ¶ 21. She requested permission to continue after MacFarlane stopped her at three minutes; MacFarlane obtained the affirmative consent of each councilmember before granting it and cut her off after two more minutes. Additionally, MacFarlane allowed two members of the public (the only ones to ask) to speak twice during the general comment session if they had not yet used up their three minutes; both were critical of the town. 10/14/19 at 2:19:40, 2:35:45.

### 6)  *May 2020 Zoom Meetings*

Plaintiff further alleges that he and similarly-minded individuals were prevented from speaking at several 2020 meetings that occurred via Zoom because of the

COVID-19 pandemic.[6]  Mayor MacFarlane was the host of the Zoom meetings, a role that carries the technical ability to unilaterally mute or unmute participants' microphones. Doc. 92-2 ¶ 22.; Doc. 92-3 ¶ 25(i).  During the meeting on May 11, 2020, Plaintiff's microphone, as well as that of Councilman McGill, remained muted despite their requests to speak. *Id.*; Doc. 89-16 at p. 227-229.  McGill called MacFarlane to tell her to unmute him and allow him to speak, but he was not unmuted. Doc. 92-3 ¶ 25(i). At the same time, other members of the audience were "yelling and making inappropriate comments and not being muted." *Id.*; Doc. 92-2 ¶ 22.  Marni Drabik stated that on one occasion her microphone became muted while she was speaking in a critical manner, although her time had not yet expired, and on another occasion she was never unmuted even though she followed the procedure for requesting to speak. Doc. 92-4 ¶ 24.

The Joint Stipulation of Facts states that Plaintiff was "unable to identify facts from which an inference could arise that Mayor MacFarlane intentionally failed to unmute him in order to prevent him from making public comment" during the May 11 meeting. Doc. 93 at 7.  However, Paula Perry attested that she heard MacFarlane say she was muting people, and then witnessed Plaintiff, McGill, and another individual be muted by MacFarlane. 92-5 ¶ 16.  Mayor MacFarlane denied preventing Plaintiff from speaking during Zoom meetings or being aware that he was attempting to be heard. Doc. 89-2 ¶ 6.  She explained that although the town "made every

---

[6] Neither party provided the recordings or minutes of these meetings to the Court.

reasonable effort to learn and apply the video conferencing technology…technical difficulties occasionally occurred." *Id.*   Plaintiff testified that a technical problem caused him to be cut off while speaking during a different meeting. Doc. 89-16 at p. 226, 229.

### 7) *Interruptions During Public Comments*

In addition, Plaintiff alleges that town officials permitted members of the public to interrupt or ridicule him while he was speaking during council meetings. Doc. 92-2 ¶ 14(e), (f).   On February 25, 2019, he addressed the council to voice criticism of the police department. Doc. 89-16 at p. 207-211.   An audience member interrupted him while he was speaking,[7] at which point Mayor Nebel directed the audience not to interrupt him because he had the floor. *Id.* at 207-208; 2/25/19 at 1:07:30.   The audience member continued to make audible side remarks throughout Plaintiff's statement.   On March 25, 2019, an audience member again interrupted Plaintiff's public comment with laugher, and he asked her if she had something to say. 3/25/19 at 3:15:50.   Mayor Nebel stopped her from responding, saying, "Public comment is supposed to be one person at a time, not a duel."   Matthew McGill also attests that Mayor MacFarlane "allowed audience members to interrupt and heckle Mr. Alimenti" on November 19, 2019. Doc. 92-3 ¶ 19.[8]

---

[7] The deposition transcript identified the audience member as Ms. Thompson, a neighbor with whom Plaintiff had a longstanding dispute. *See* Doc. 89-16 at 207.
[8] The recording of this meeting was not provided to the Court.

### B. First Amendment Retaliation

In Plaintiff's second claim, he alleges that he and others who were critical of the town were retaliated against for their speech.  Such retaliation took several forms.

#### 1) *Speech Suppression, Insulting Comments, and Violations of Privacy*

First, Plaintiff asserts that the retaliation included the speech suppression at council meetings described *supra*.  Marni Drabik observed that "opinions were not welcome if they went against the usual business of the Town." Doc. 92-4 ¶ 4.  McGill states that at least two other members of the public were stopped from speaking for their full allotted time when expressing criticism of the town. *See* Doc. 92-3 ¶¶ 20, 25(i). Certain council members, including McGill, were also prevented from speaking at meetings and "silenced when they asked questions…[that] were relevant to the community and in fact asked by residents to bring before the council." Doc. 92-4 ¶ 4. McGill explained that Mayors Nebel and MacFarlane either cut him off or prevented him from speaking on many occasions. Doc. 92-3 ¶¶ 11, 15, 19, 25(a)-(k).[9]

---

[9] McGill identified several meetings as examples. Doc. 92-3 ¶¶ 11, 15.  Councilman McGill and Mayor Nebel engaged in several acrimonious exchanges during the January 14, 2019 meeting in which they argued with each other and each raised their voice.  McGill was speaking at length regarding what he characterized as ethical violations, breaches of town law, and other improprieties he had observed town officials and Chief Thomas committing. *See* 1/14/19 at B00:00 *et seq.*  At various times, Nebel stated, "Look, I'm about to shut this meeting down because you're becoming a pain in the ass," "I am cutting you off because I think everybody's getting tired of listening to you," and "All right, I'll sit here and listen to you while you're running your mouth." *Id.* at B06:00 *et seq.*  McGill was ultimately permitted to finish his statements. *Id.* at B16:15.

At the March 25 meeting, during another heated exchange between McGill and Nebel, Nebel stated, "If you're going to make this about me—" 3/25/19 at 18:30:00. When McGill clarified that he was not, Nebel continued "If not, be quiet."  Nebel went on to explain that he had only been the mayor for two months and while he intended to address any practices his

In addition, Plaintiff alleges that he, McGill, and McGill's supporters were insulted or threatened by town officials in retaliation for their speech.  At a council meeting on March 25, 2019, police chief Herbert Thomas addressed the council. Doc. 89-16 at p. 218-219.  When he finished speaking, he said to Plaintiff "did you hear that, Bernie, how come you're not clapping?" *Id.*  Plaintiff interprets this statement as subjecting him to ridicule. *Id.*; Doc. 92-2 ¶ 14(f).  Further, at the end of Plaintiff's public comment on February 25, 2019, he observed Lawrence Chester, the code enforcement officer employed by the police department, laughing while he was speaking. Doc. 89-16 at 207-08.  When he asked Chester if he had a comment to make, Chester responded, "I just think it's ridiculous what you're saying, sir, that's all." *Id.* at 211, 215-16; 2/25/19.  Plaintiff also attests that in December 2018 a council member called him "diseased, delusional, and OCD," while making a hand gesture as if he were

---

predecessor had begun that violated town laws, he had not yet had the chance.  McGill disputed this with an example of an ordinance he believed town officials were still violating and that should be fixed, and Nebel responded "This town's been functioning very well for a long time without you."  During the same exchange, Nebel explained that at a previous meeting he had been "making fun" of McGill.  He also told McGill that he was out of time, and when McGill said there was no time limit that applied to him, Nebel stated "Okay, then we'll all just take a nap."

McGill also attests that Martha MacFarlane prevented him from speaking at council meetings after she became the mayor. Doc. 92-3 ¶ 19, 25(b), (g).  According to the meeting recordings from September 23, 2019 and October 14, 2019, MacFarlane implemented a meeting policy in which council members were only permitted to make reports regarding agenda items and "town business," in contrast to the practice under Mayor Nebel that had permitted councilor comments on a broad range of topics. *See* 9/23/19 at 40:00; 10/14/19 at 1:13:10, 1:17:10, 1:35:45.  MacFarlane and McGill disagreed about whether the topics McGill intended to address qualified as town business, and MacFarlane stopped him from bringing them up. *Id.* MacFarlane also stated that she had declined to add items McGill requested to the meetings' agenda because she did not believe they were town business instead of inflammatory topics and personal comments. *Id.*

crazy, in the presence of several other individuals. Doc. 92 ¶ 15(a).  Plaintiff repeated this statement during his public comments at the January 14, 2019 and March 25, 2019 meetings to audible laughter. 1/14/19 at D1:50; 3/25/19 at 3:16:10.

Marni Drabik reported that at council meetings Mayor Nebel "would make extremely uncalled for nasty and insulting remarks to both council persons as well as residents," including her; on one unspecified occasion he called McGill an "asshole." Doc. 92-4 ¶ 4; *see* n.9, *supra*.  Drabik also described the existence of a private Facebook group made up of McGill's opponents, including former town officials and the wife of Chief Thomas, which ridiculed and threatened those with whom its members had political differences, including Plaintiff and McGill. Doc. 92-4 ¶¶ 14-20.  The Facebook group published emails that Drabik sent only to Mayor MacFarlane without any redaction. *Id.* ¶ 18.  In Drabik's view, "if you buck the Town, you can be sure people will go after you on social media, they will try to destroy your life by demonizing you." *Id.* ¶ 20.  In May 2019, the town released to the public a body camera video of the interior of Plaintiff's home and guests taken during a noise complaint investigation. Doc. 92-2 ¶ 15(b).  McGill reported that the town published his personal information on the internet in June 2018, placing him at risk of identity theft. Doc. 92-3 ¶ 23.

### 2) *Code Enforcement*

Another category of alleged retaliation related to code enforcement.  As one member of the public stated at a council meeting, as reported by McGill, " people [are] being targeted for enforcement…[and] 'do not speak up because they are afraid.'" 92-

3 ¶ 17.[10]  Plaintiff asserts that such retaliation occurred against him in March 2019, when code enforcement officer Lawrence Chester issued him a Courtesy Notice of Violation of Code for storing his boat in the garage. Doc. 93 at 9-10.[11]   The notice warned Plaintiff that the failure to correct the violation within 30 days may result in a notice to appear before a magistrate. Doc. 89-16 at p. 232.  The town posted the fact that Plaintiff had been issued such a notice on its website, even though, he explained, it did not always do so. *Id.* at 233-234.  Challenging whether his actions violated any ordinance, Plaintiff emailed the town council and town attorney a number of times to "let them know that I was being targeted, that the violation didn't exist, and they better correct it." *Id.* at 232-235.  The town attorney concluded the ordinance was vague and closed the code enforcement case within seven days. Doc. 93 at 10.  Chester explained that during this incident he employed the same procedures he always uses when he observes a code violation. Doc. 89-1 ¶ 7.

Paula Perry, who described herself as a vocal critic of town officials since 2013, reported two code enforcement incidents she believed constituted retaliation. Doc. 92-

---

[10] The recording of the meeting at which this statement was made, April 4, 2019, was not provided to the Court.

[11] Plaintiff also asserts that code enforcement actions took place in late May 2018. *See* Doc. 93 at 8-9, 8 n. 4; Doc. 89-16 at p. 236; Doc. 89-1 ¶¶ 5-6.  However, these incidents predated the cement spill that he alleges prompted him to begin exercising his First Amendment rights on June 14, 2018. Doc. 92-2 ¶ 3.  They also preceded Plaintiff's criticism of Chester's handling of his code violation complaint against a neighbor beginning in early June 2018. *See* Doc. 60 ¶ 54(b); Docs. 89-4, 89-5.  Accordingly, they cannot form the basis of a First Amendment retaliation claim.

Similarly, McGill reports that he was the victim of selective code enforcement in an incident involving his fence, but the incident predated his political activities and First Amendment expression. Doc. 92-3 ¶¶ 3-8.

5 ¶ 3.   In the first, soon after she made a police report against members of local law enforcement in 2013, the then-code enforcement officer "became aggressive in his code enforcement towards me" regarding parking on a vacant lot next to her home. *Id.* ¶ 7. Although many others parked on the same lot, the officer began sending her "harassing messages on social media about cars that were not even mine." *Id.* ¶¶ 7-8.   In the second, soon after she had criticized Mayor Nebel and other town officials and had vocally supported McGill, she received a notice of code violation for two boats she parked on her property. *Id.* ¶ 12.   She believed this constituted selective enforcement, both because she did not believe her actions violated the town code, and because she "knew of other code violations in Howey that were going unenforced." *Id.* ¶ 13.   Perry explained that between November 2018 and February 2019 she corresponded "numerous times via email, as well as in person, with Chief Thomas, Mayor Nebel, and Officer Chester about both my alleged code violations and the issue of selective code enforcement." *Id.* ¶ 14.   According to the recording of the council meeting on January 14, 2019, Perry raised the issue of her alleged code violation in the general public comment session. 1/14/19 at D20:40.   Nebel told her any continued actions by the code enforcement officer had resulted from a miscommunication, and she was not at risk of the violation notice being escalated because she was involved in ongoing discussions about the issue with the town. *Id.*   The town council, including Nebel, unanimously elected Perry to the town's zoning commission on February 25, 2019. 2/25/19 at 2:38:00.

### 3) Police Involvement

The final type of alleged retaliation involved police investigations. Plaintiff asserted that the police and Mayor Nebel both failed to investigate a complaint of criminal harassment against his neighbor in November 2018. Doc. 92-2 ¶ 14(b), (c); *see* Docs. 89-9, 89-10. Plaintiff and his neighbor had each made criminal complaints against each other for similar conduct. Doc. 93 at 10-11. Chief Thomas concluded that the dispute was a civil matter, but Plaintiff continued to believe his neighbor should be criminally charged and attempted to escalate the matter. *Id.* at 11.

Marni Drabik also alleges that she was the victim of a crime that went uninvestigated. Doc. 92-4 ¶¶ 7-13. Immediately after a town council meeting in October 2019, a supporter of Mayor MacFarlane physically assaulted her, necessitating the use of force by a nearby police officer to remove the perpetrator from the meeting. *Id.* ¶¶ 7-8. Although MacFarlane and other council members witnessed the assault, they did nothing to assist her or follow up on the incident. *Id.* ¶ 12. Drabik was told by the police department and the sheriff's office that Chief Thomas was aware of the incident and would follow up with her, but he failed to do so. *Id.* ¶¶ 9-11. She also received no response to her emails to MacFarlane and other officials expressing fear for her safety because of the incident. *Id.* ¶ 13. Drabik explained that she did not want to have the perpetrator arrested "because I was afraid more repercussions would happen," and that she "watched my back" after filing a report with the sheriff's office. *Id.* ¶ 11.

### 4)  *Impacts of Retaliation*

Plaintiff alleges that the pattern of retaliation "fostered an environment of harassment" against him and his wife. Doc. 92-2 ¶ 25.  As a result, they moved out of Howey-in-the-Hills. *Id.*  Both have also experienced stress-related health problems. *Id.* ¶ 27.  McGill also left the town in 2020 after Mayor MacFarlane and her supporters ran a successful recall campaign against him. Doc. 92-3 ¶¶ 2, 25(l).  Paula Perry, too, moved out of town as a result of town officials' actions. Doc. 92-5 ¶ 17.  As McGill and Plaintiff reported that then-councilman Nebel stated at a July 2020 council meeting, "[I]n Howey, 'either you go along with the program, or we make you leave town.'" *Id.* ¶ 26; Doc. 92-2 ¶ 254.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).  In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).  Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50). "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

Defendant moves for summary judgment as to both counts of the Third Amended Complaint. The Court concludes that summary judgment is warranted as to Counts I and II, because no genuine issues of material fact exist and Defendant is entitled to judgment as a matter of law.

## A. Count I: Infringement of First Amendment Rights

### 1) *Restrictions on Speech in Limited Public Fora*

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). The extent to which the government may restrict private speech depends on the public or private nature of the forum in which the speech occurs. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800 (1985). One type of forum in which governments are permitted to restrict speech is a limited public forum, which "exists where a government has reserve[d it] for certain groups or for the discussion of certain topics." *Walker*, 576 U.S. at 215, quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Governments may restrict the content of speech in a limited public forum in order to confine the forum "to the limited and legitimate purposes for which it was created." *Rosenberger*, 515 U.S. at 829; *see Barrett v. Walker Cnty. School Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017). However, any such restriction must be reasonable in light of the forum's purpose and cannot discriminate based upon the speaker's viewpoint. *Id.*; *see also Good News Club v. Milford Central School*, 533 U.S. 98, 106 (2001) ("[W]hile a public entity may not censor speech about an authorized topic based on the point of view expressed by the speaker, it has broad discretion to preserve the property under its control for the use to which it is lawfully dedicated.").

Viewpoint discrimination occurs when the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. A viewpoint-neutral restriction on content "is one that is evenhandedly applied without regard to the specific message being advocated." *Moms for Liberty – Brevard Cnty., Fla. v. Brevard Public Schools*, 582 F.Supp.3d 1214, 1219 (M.D. Fla. 2022). Provided the restriction serves purposes unrelated to the content of expression, it will be deemed neutral even if it "has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

For a speech restriction to be upheld as reasonable, "the government must avoid [its] haphazard and arbitrary enforcement[.]" *Cambridge Christian School, Inc. v. Florida High School Athletic Ass'n, Inc.*, 942 F.3d 1215, 1243 (11th Cir. 2019). The government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out": there must be "objective, workable standards guiding the regulation's enforcement." *Minn. Voters Alliance v. Mansky*, --- U.S. ---, 138 S.Ct. 1876, 1888, 1891 (2018). If the policy itself is facially reasonable, a plaintiff's claims will "hang on whether the policy was: (1) used in a way that discriminated based on a speaker's viewpoint, or (2) enforced arbitrarily." *Gundy v. City of Jacksonville, Fla.*, 528 F.Supp.3d 1257, 1265 (M.D. Fla. 2021), citing *Cambridge*, 942 F.3d at 1240; *see Dayton v. City of Marco Island*, 2:20-cv-307-SPC-MRM, 2020 WL 2735169, *2 (M.D. Fla. May 26, 2020) (denying motion to dismiss where plaintiffs were prevented from speaking

critically about city councilor despite policy that allowed public comment on "any subject matter not scheduled on the agenda").

In *Cleveland v. City of Cocoa Beach, Fla.*, 221 Fed. App'x 875, 878-79 (11th Cir. 2007), for example, the court found that the mayor's prohibition against the display of campaign messages at a city council meeting was content-based but viewpoint-neutral, as she "restricted the promotional campaign materials evenhandedly, without regard to the particular candidate that was being endorsed." Indeed, "[s]he banned not only a message in support of her opponent, but also a message in support of her own reelection." *Id.* at 879. In upholding summary judgment for the defendants, the court rejected the plaintiff's argument that two individuals were treated differently during enforcement of the restriction, finding that the difference in the way they were treated was the result of their own reactions rather than their viewpoints. *Id.*

Similarly, in *Gundy*, the court concluded that a speech restriction was viewpoint-neutral where it had an apolitical purpose, was consistent with a viewpoint-neutral policy, and preserved the forum for its intended purpose. 528 F.Supp.3d at 1265. Although the plaintiff and another witness believed his microphone was cut off because of his viewpoint, the court rejected these beliefs as failing to dispute the only evidence of the presiding officer's subjective intent, which was explained in the officer's deposition and another memorandum. *Id.* at n.6. The plaintiff also failed to present evidence that town officials actually enforced the rules arbitrarily; in contrast, the only comparator incident he offered was substantively distinct from plaintiff's

incident. *Id.* at 1266-67.  As such, summary judgment was warranted in favor of the city. *Id.* at 1267.

The presiding officer of a government meeting is given substantial discretion in enforcing facially neutral restrictions.  After all, "[t]here is a significant governmental interest in conducting orderly, efficient meetings of public bodies." *Rowe v. City of Cocoa*, 358 F.3d 800, 803 (11th Cir. 2004).  As a result, the Eleventh Circuit has held that "[a]n erroneous judgment call on the part of a presiding officer does not automatically give rise to liability for a constitutional tort," cautioning against a hindsight view of decisions that were made "without the benefit of leisure[ly] reflection." *Jones v. Heyman*, 888 F.2d 1328, 1334 (11th Cir. 1989).  In *Jones*, the court reversed a trial verdict in favor of the plaintiff, a member of the public who was expelled during a city commission meeting while he was making a public comment. *Id.*  The court emphasized that he was expelled before expressing the substance of his views; and although "one could reasonably infer from [his] opening comment and his mannerisms that his opinion would be critical of the commission's actions," the court instead credited the mayor's testimony that Jones was expelled only because he was being disruptive. *Id.* at 1332.  "[W]e also realize and emphasize that we necessarily must view this brief incident from hindsight, and we are hesitant to speculate about the mayor's exact mindset at the moment he ordered Jones' removal." *Id.* [12]

---

[12] The Court rejects Defendant's interpretation of *Jones* as "suggest[ing] that the Eleventh Circuit will not permit factfinders to speculate about the mindset of mayors who preside over public meetings," Doc. 96 at 6, as an oversimplification of this holding.

Accordingly, it held that the plaintiff failed to prove that the mayor's actions resulted from viewpoint discrimination rather than the need to keep order. *Id.*; *see also Dyer v. Atlanta Independent School System*, 852 Fed. App'x 397, 402 (11th Cir. 2021) (upholding summary judgment for defendant and finding that plaintiff's removal from school board meeting for his "disruptive behavior and lack of proper decorum" was permissible, irrespective of the content of his statements).

To determine whether a speech restriction was applied in a discriminatory manner, courts review identified incidents in the context of the entire record.  In *Moms for Liberty*, 582 F.Supp.3d 1214 (M.D. Fla. 2022), *aff'd*, No. 22-10297, 2022 WL 17091924 (11th Cir. Nov. 21, 2022), for example, the court denied a preliminary injunction because it found the plaintiffs were unlikely to succeed in either a facial or as-applied First Amendment challenge involving school board meetings.  The court held that the record did not support the plaintiffs' argument that the defendants restricted the plaintiffs' critical viewpoints while encouraging views they preferred. *Id.* at 1220.  Although the plaintiffs identified four instances in which their supporters' speech was restricted, the court noted that their group members were permitted to speak unimpeded more than a hundred other times. *Id.*  Further, "those few interruptions were regularly brief and respectful, and Plaintiffs freely finished speaking." *Id.*  Importantly, non-group members were also interrupted when they violated meeting policy. *Id.*  The court concluded that the policy was "evenhandedly applied as a whole." *Id.*  Accordingly, the plaintiffs did not meet their burden of proof for a preliminary injunction.  Likewise, in *McDonough v. Garcia*, 19-21986-CIV-

MORENO, 2022 WL 971392, *2 (S.D. Fla. March 31, 2022), the plaintiff was removed from a city council meeting after he stated to a councilman, "I'd appreciate if you got something to say to me, you say it to my face," which a police officer perceived as a threat.  Examining the entire record, the court found that, "[g]iven that the Plaintiff spoke for almost the entirety of his allotted time and had spoken on prior occasions on the same topics," there was nothing in the record that supported the conclusion that he was expelled based on the content of his speech" instead of the statement perceived as a threat. *Id.* at *7.  The court therefore found that the plaintiff failed to meet his burden of establishing that the police officer violated clearly established law for the purpose of defeating qualified immunity. *Id.* at *8; *see also Harris v. City of Valdosta, Ga.*, 616 F.Supp.2d 1310, 1322-23 (M.D. Ga. 2009) (granting summary judgment to defendants and finding there was no genuine dispute that plaintiffs were removed from city commission meeting due to their disruptive conduct rather than disapproval of their message, in light of evidence that many others, including some of the plaintiffs, were allowed to speak on the same issue at length before and after the removal).

### 2)  *Plaintiff's Speech Was Not Unlawfully Restricted*

Here, the parties agree that the town council meetings were limited public fora,[13] and Plaintiff does not challenge Defendant's ability to apply Resolution 2013-010 as it

---

[13] *See Cambridge Christian School Inc. v. Fla. High School Athletic Ass'n, Inc.*, 942 F.3d 1215, 1237 (11th Cir. 2019) ("[W]e have identified the public-comment portions of school board meetings, among other things, as limited public forums"); *Dayton v. City of Marco Island*, 2:20-

is written. Doc. 80 at 2, 14-16; Doc. 92 at 10.  However, Plaintiff argues that a genuine dispute of material fact exists as to whether the resolution was applied in a content- or viewpoint-neutral manner. *Id.* at 10-11.  Specifically, Plaintiff alleges that he was prevented from speaking for the same length of time, and as free from interruption and ridicule, as other members of the public who were not critical of town officials. Doc. 60 ¶¶ 74-79.

In its motion for summary judgment, Defendant contends that there is no genuine dispute of material fact because Plaintiff was not prevented from exercising his First Amendment rights, and any restrictions placed on his speech—which Defendant concedes was protected—were consistent with the rules governing limited public fora. Doc. 80 at 2, 14-16.  Defendant argues that town officials strictly complied with Resolution 2013-010 with respect to Plaintiff's speech, "or to the extent it used discretion in [its] application, the discretion worked to Alimenti's favor." *Id.* at 17. Moreover, Plaintiff's rights were not impermissibly burdened because he was offered a complete opportunity to comment at every meeting, despite violating the procedural rules. *Id.* at 17-18.  Defendant also highlights Mayor Nebel's intervention on Plaintiff's behalf when he was interrupted by an audience member. *Id.* at 18.  Lastly, Defendant argues that Mayor MacFarlane's alleged failure to unmute Plaintiff during the May 2020 Zoom meeting does not constitute evidence of a speech restriction where it was

---

cv-307-SPC-MRM, 2020 WL 2735169, *2 (M.D. Fla. May 26, 2020) (collecting cases and concluding "[a] city council meeting is typically a limited public forum").

"due to a technical problem associated with a new and unfamiliar technology," given that the mayor "denied she prevented him from making public comment." *Id.*

Responding in opposition, Plaintiff argues that the evidence creates an issue of material fact as to whether Defendant "acted with a motive to suppress Alimenti's speech based on his viewpoint." Doc. 92 at 11.  He does not point to any specific evidence within his memorandum of law. *Id.*  However, in his statement of material facts he describes three instances that he contends show he was not afforded the same opportunity to speak as others who were not critical of the town, highlighting occasions when others were allowed to exceed the three-minute time limit. *Id.* at 1-5; *see supra* Section I(A).  Defendant criticizes this approach in its reply as "cherry pick[ing]" without necessary context. Doc. 96 at 16-17.  Moreover, Defendant asserts, Plaintiff cannot defeat summary judgment through mere suspicion of the presiding officers' motives. *Id.* at 7.

The Court agrees with Defendant that there is no genuine issue of material fact with regard to Count I.  First, the meeting recordings do not substantiate Plaintiff's allegation that his First Amendment rights were infringed at the meetings on November 26, 2018 or January 14, 2019.  On November 26, Plaintiff was permitted to speak on two separate occasions without being cut off, including one comment that lasted well over three minutes.  The only aspect in which his speech was restricted was that he was denied the ability to speak a second time in the same comment session.  Resolution 2013-010 does not contain any provision for multiple comments in the same session.  Further, no one was permitted to speak twice in the same comment

session during the meetings over which Mayor Nebel presided; indeed, at the March 25, 2019 meeting Nebel prevented someone from speaking again even though the speaker was expressing criticism of Councilman McGill, a viewpoint Plaintiff asserts Nebel favored.  When Mayor MacFarlane took over in the fall of 2019, there was only one occasion when she allowed a member of the public to speak twice and exceed three minutes.  The fact that this sole instance occurred nearly a year after the November 26, 2018 meeting and in front of a different presiding officer renders it too distinct from Plaintiff's incident to qualify as an example of a selective or viewpoint-based speech restriction. *See Gundy*, 528 F.3d at 1266-67.  Moreover, there are non-viewpoint reasons to restrict members of the public from speaking twice during a public comment session, particularly when they have already exceeded the technical time limit. *See Ward*, 491 U.S. at 791 (restriction that serves purposes unrelated to content will be deemed neutral even if it "has an incidental effect on some speakers or messages but not others").  No reasonable jury could conclude that Plaintiff's speech was restricted as a result of his viewpoint on November 26, 2018.

Similarly, the January 14, 2019 meeting did not contain any viewpoint discrimination.  Plaintiff was again permitted to speak for longer than three minutes without being cut off and to speak during two different comment sessions.  Plaintiff's characterization of being stopped from speaking before three minutes were up is not supported by the recording.  While Plaintiff was still interacting with the town attorney after his second comment, but after he had given up the floor, Mayor Nebel granted a different speaker's request to have the floor.  Nebel later referred to the policy of not

letting someone speak a second time if they had already used up their time, but did not actually apply it to Plaintiff—who had not used up three minutes during that comment session—because Plaintiff did not approach the microphone to speak again.   The January 14 meeting does not create a genuine issue of material fact regarding viewpoint discrimination.[14]

Plaintiff highlights the fact that many members of the public were allowed to exceed the limit of three minutes per public comment contained in Resolution 2013-010.  However, the recordings demonstrate that this rule—like most of the procedural rules—was rarely enforced by the presiding officer, regardless of the viewpoint the speaker was expressing.  The record is replete with examples of speakers critical to the town or its officials, including Plaintiff, being permitted to exceed the time limit and speak for as long as they wanted.  One of the few members of the public whom Mayor Nebel stopped from speaking was a supporter of the town and its police department.  Mayor MacFarlane generally enforced the time limit at the October 14, 2019 meeting, but also granted exceptions to it without any discernible viewpoint-based pattern.  Despite viewing the record in the light most favorable to Plaintiff, there is simply no evidentiary support for a claim that the three-minute rule was applied selectively based on the speaker's viewpoint.  As in *Cleveland*, 221 Fed. App'x at 878-79 and *Moms for*

---

[14] Because the Court concludes that the January 14 meeting does not raise any genuine issue of material fact, it need not address Defendant's argument that it should not consider this meeting because it is inconsistent with Plaintiff's deposition testimony, in which he stated there were only two meetings in which he was prevented from speaking or cut off. Doc. 96 at 1-4.

*Liberty*, 582 F.Supp.3d at 1220, the record demonstrates that the three-minute policy was enforced—or not enforced—evenhandedly. *Cf. Dayton*, 2020 WL 2735169 at *2.

The May 11, 2020 Zoom meeting is the last meeting in which Plaintiff argues his opportunity to speak was restricted; he alleges Mayor MacFarlane intentionally muted him and other critical speakers. The recording of this meeting was not provided to the Court, and the record contains a contradiction regarding the existence of evidence to support Plaintiff's allegation. *Compare* Doc. 93 at 7 (joint stipulation that Plaintiff is "unable to identify facts from which an inference could arise that Mayor MacFarlane intentionally failed to unmute him in order to prevent him from making public comment") *with* Doc. 92-5 ¶ 16 (Marni Drabik declares that she "heard Mayor MacFarlane say she was muting people" at unidentified Zoom meetings in 2020). Drabik's declaration lacks any details, however, such as the date of the meeting and the context of the statement, from which the Court could infer MacFarlane's motive in making it. For example, did she make it during a time when Plaintiff or McGill was visibly attempting to speak or had their hand raised? Or was the statement an observation of technical difficulties she was experiencing? Or, was it made at a later meeting in order to warn the audience that she would be preventing the type of "yelling out and making inappropriate comments" that McGill attested occurred in May? *See* Doc. 92-3 ¶ 25(h). Although the Court makes all reasonable inferences in Plaintiff's favor, the absence of these details from Drabik's declaration—coupled with Plaintiff's stipulation, MacFarlane's declaration that she did not intentionally fail to unmute Plaintiff and that technical problems had sometimes occurred, and Plaintiff's

concession that a technical problem hindered his ability to speak at a different Zoom meeting—prevents the Court from concluding that a genuine issue of material fact exists as to whether MacFarlane acted with a motive to suppress Plaintiff's viewpoint on May 11. *See Jones*, 888 F.2d at 1332 (declining to speculate about the mayor's mindset in light of mayor's unrefuted testimony that he expelled a speaker for being disruptive, which the evidence showed he was); *Gundy*, 528 F.Supp.3d at 1265 n.6 (plaintiff's and another witness's belief about presiding officer's intent did not create a genuine dispute of fact in the face of direct evidence of the intent).

Finally, to the extent Plaintiff argues his opportunity to speak at council meetings was infringed by the presiding officer permitting him to be interrupted by audience members, this contention is not supported by the meeting recordings.  On both February 25 and March 25, Mayor Nebel chastised the audience member who interrupted Plaintiff or prevented them from engaging further.  Moreover, McGill's declaration that Mayor MacFarlane "allowed audience members to interrupt and heckle" Plaintiff on November 19, 2019 is, without more information, merely a "scintilla of evidence" that does not suffice to create a genuine issue of material fact as to whether Plaintiff's opportunity to speak at the November 19 meeting was limited due to his viewpoint. *See Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

Viewing the evidence in the light most favorable to Plaintiff, and in the context of the entire record, *see Moms for Liberty*, 582 F.Supp.3d 1214; *McDonough*, 2022 WL 971392 at *2, the Court cannot conclude that Defendant unlawfully restricted

Plaintiff's speech during town council meetings.  To the extent his speech was limited at all, the restrictions were reasonable in light of the forum's purpose and were applied even-handedly, without regard to the speaker's viewpoint. *See Barrett*, 872 F.3d at 1225.  Because no reasonable jury could find that Defendant acted with a motive to suppress Plaintiff's speech based on his viewpoint, summary judgment in Defendant's favor is warranted as to Count I.

### B. Count II: First Amendment Retaliation

Plaintiff alleges that town officials took four types of actions against him in retaliation for his critical speech: 1) unlawfully restricting his speech at town council meetings; 2) publicly insulting him or violating his privacy; 3) selective code enforcement proceedings; and 4) inadequate investigation of a crime committed against him. *See* Doc. 60 ¶¶ 54, 157.  He bolsters his allegations through evidence that others who were critical of the town experienced similar actions by town officials. *See generally* Section II(B), *supra*.  As to the first type, the Court has already concluded that Plaintiff's opportunity to speak at town council meetings was not unlawfully restricted. *See* Section A(2), *supra*.  Thus, it need not consider or discuss whether this constituted retaliation for his critical speech.

A threshold question is whether Defendant, as a municipal entity, may be held liable for its officials' alleged violations of Plaintiff's constitutional rights.[15]  Under *Monell v. Dep't of Social Servcs. of City of N.Y.*, 436 U.S. 658, 690 (1978), a local governing

---

[15] Defendant raises this basis for summary judgment only as to Count II, not Count I. *See* Doc. 89 at 19-21; Doc. 92 at 12 n.1.

body may be sued directly under 42 U.S.C. § 1983 when the action that is alleged to be unconstitutional results from the implementation of the government's policy.  The policy need not be authorized by law; a municipality may also be sued for the "persistent and widespread discriminatory practices of state officials" that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691 (quotation omitted).  A local government is liable "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" under § 1983. *Id.* at 694.

The Eleventh Circuit has summarized the doctrine of a municipal custom as follows: "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991).  In *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001), for example, it concluded that "sexual harassment was the ongoing, accepted practice at the City and that the City Commission, Mayor, and other high ranking City officials knew of, ignored, and tolerated the harassment," such that it amounted to an unconstitutional policy or custom.  The court detailed numerous instances of town employees sexually harassing female employees, as well as evidence that high-ranking officials were aware of it but took no remedial action. *Id.* at 1308-11; *see also Perez v. Miami-Dade Cnty.*, 168 F. App'x 338, 340-41 (11th Cir. 2006) (genuine issue of fact that county had custom of failing to investigate or discipline use of excessive force was raised by evidence that included sworn statements by officers that it was understood they would not be disciplined for

excessive force, records showing the county had only disciplined 16 officers for excessive force during a ten-year period, sworn statements from complainants, and evidence that the county had received affirmative notice of a widespread problem with excessive force).

On the other hand, random acts or isolated incidents are insufficient to establish a custom. *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). The court held in *Church v. City of Huntsville*, 30 F.3d 1332, 1345-46 (11th Cir. 1994), that city employees did not have a pervasive practice of violating homeless individuals' constitutional rights where the only instances specifically testified to either were not constitutional violations or were isolated incidents that occurred a year or more before the preliminary injunction hearing. *See also Khoury v. Miami-Dade Cnty. School Bd.*, 4 F.4th 1118, 1132 (11th Cir. 2021) (evidence of prior incidents did not establish a custom or practice because they were too remote in time or did not show a constitutional violation); *Wakefield v. City of Prembroke Pines*, 269 F. App'x 936, 940 (11th Cir. 2008) (plaintiff failed to create a genuine issue of material fact as to whether there was a persistent and widespread city custom based on two incidents that occurred thirteen months apart).

Moreover, the proffered evidence must demonstrate a custom of an identical constitutional violation, not one that is merely related. *See Pellegrino v. Wengert*, 703 F. App'x 892, 898 (11th Cir. 2017) (rejecting evidence that an officer was demoted after reporting another agency's excessive force because, although "[t]hat demotion might be evidence that the Sheriff's Office punishes officers who report another officer's

misconduct…it is not evidence that the Sheriff's Office has a custom of allowing its own officers to use excessive force.").

To hold the municipality liable, "there must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Snow ex rel. Snow v. City of Citronelle, Ala.*, 410 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted). In other words, the policy or custom must have caused the violation of the plaintiff's constitutional rights. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). For example, the Eleventh Circuit affirmed the grant of summary judgment to the school board in *Denno v. School Bd. of Volusia Cnty., Fla.*, 218 F.3d 1267, 1277-78 (11th Cir. 2000), where the plaintiff failed to identify or adduce evidence of any prior instance where a student was punished for displaying the Confederate flag. Although three other students were disciplined for similar displays in the immediate aftermath of the plaintiff's suspension, these incidents did not demonstrate a persistent and widespread practice of the school board that *caused* the violation. *Id.*; *see also Moody v. City of Delray Beach*, 609 F. App'x 966, 968 (11th Cir. 2015) (complaint was properly dismissed where it failed to allege a city custom or policy that caused the violation of her rights).

Here, Plaintiff argues that the town of Howey-in-the-Hills is liable under *Monell* because the retaliatory acts that violated his First Amendment rights resulted from the town's unofficial policy or custom. Doc. 92 at 14. He asserts that Defendant adopted and enforced a custom to thwart citizens' speech and political activities, as demonstrated by the "numerous separate violations" of Plaintiff's and other citizens' rights over a period of more than two years. *Id.* Defendant argues that there is no

evidence of a widespread practice that would place the mayor or town council on notice. Doc. 89 at 21.[16]

The Court agrees with Defendant that the evidence offered in support of a widespread or persistent practice of First Amendment retaliation is scant.  For the purpose of the *Monell* analysis the Court will assume, *arguendo*, that the various actions Plaintiff identifies as retaliation for exercising his First Amendment rights do, indeed, constitute retaliation.  But the Court concludes that Plaintiff has not proffered enough evidence of other incidents to create a genuine issue of fact as to whether town officials had an ongoing, pervasive practice of engaging in these actions as retaliation. Although he has identified a handful of other incidents bearing some similarity to his own, they are too isolated or remote to establish a custom.  Each type of retaliatory act will be discussed in turn. *See Pellegrino*, 703 F. App'x at 898.

First, Plaintiff contends that town officials publicly insulted him in December 2018 and the spring of 2019, and violated his privacy in May 2019 by releasing a video of his home to members of the public.  He presented evidence that the town also violated Matthew McGill's privacy in the summer of 2018 by publishing his personal information on its website.  However, McGill's declaration is unclear as to whether he had exercised his First Amendment rights by the time the publication occurred.  He explained that he was in an ongoing dispute about alleged code violations of his

---

[16] Defendant also contends that the evidence does not demonstrate an act or decision of a final policy-maker, which is another basis for municipal liability. Doc. 89 at 19-20.  Plaintiff appears to concede that *Monell* liability does not exist on this basis. Doc. 92 at 12.

property beginning in February 2018, and the dispute caused him to run for town council in the November 2018 election. Doc. 92-3 ¶¶ 3-8.  It is therefore not clear whether the publication in June 2018 could be considered retaliation for his speech or political activity, rather than for the code violation dispute itself.  In any event, a single incident is inadequate to establish a custom of privacy violations as retaliation for exercising First Amendment rights. *See*, *e.g.*, *Wakefield*, 269 F. App'x at 940.

In addition, Marni Drabik explained that a group of community members maintained a private Facebook group in which they ridiculed McGill, Plaintiff, and others who criticized town officials. Doc. 92-4 ¶¶ 14-20.  But Drabik does not allege that this group was officially sanctioned by the town, that any current town employees or officials were members of the group, or that its posts were even visible to non-members.  Plaintiff has not established that the existence of this group or its private posts violated the constitutional rights of its targets, such that it could be considered evidence of a custom of retaliatory defamation by town officials like Plaintiff alleges. *See Church*, 30 F.3d at 1345-46.

The evidence that Mayor Nebel insulted McGill at council meetings in the spring of 2019 presents a somewhat closer question. *See* Section II(B)(1) n.9, *supra*. The insulting statements were made by the mayor in an official setting to a fellow councilmember who was criticizing him.  On the other hand, they were made in the context of a recurring political argument between Nebel and McGil, and Nebel's sentiments were not echoed by any other council members or directed toward any other individuals.  While Nebel's comments were certainly unprofessional, they are

not enough to demonstrate a pervasive practice of town officials insulting or defaming members of the public who criticize them.  Nor do they demonstrate a custom that *caused* different town employees to insult Plaintiff. *See Denno*, 218 F.3d at 1277-78.

Next, Plaintiff cites a code enforcement action that was initiated against him in March 2019.  Paula Perry also attested that she was the victim of selective code enforcement in 2013 and 2018 in retaliation for her critical speech.[17]  Without more, however, just as in *Khoury* and *Wakefield*, these two incidents are either too remote or too isolated to constitute a pattern. *See Khoury*, 4 F.4th 1118 at 1132; *Wakefield*, 269 F. App'x at 940.[18]  Similarly, evidence of only one other instance in which town officials failed to adequately investigate a criminal complaint in retaliation for the victim's speech, *see* Doc. 92-4 ¶¶ 7-12, as Plaintiff alleges happened to him, is inadequate to create a genuine issue of fact that it was the town's custom or policy to do so— particularly when the only other instance occurred one year after Plaintiff's.

As to each type of retaliation Plaintiff alleges, the Court concludes he has not created a genuine issue of fact as to whether a widespread practice existed that

_____

[17] The town council's unanimous election of Perry to the zoning commission soon after the resolution of the 2018 enforcement action cuts against her characterization of this action as retaliatory.  However, for the purpose of the motion for summary judgment and the *Monell* analysis, the Court will assume that it was.

[18] McGill's declaration also reported that a citizen stated, "people [are] being targeted for enforcement…[and] 'do not speak up because they are afraid.'" 92-3 ¶ 17."  He did not identify the speaker, nor was the meeting recording provided to the Court.  A declaration used to oppose a motion for summary judgment must be made on personal knowledge and set out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4).  Inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).  Plaintiff has not identified any means of reducing McGill's report of a different person's hearsay statement to admissible form.  Accordingly, the Court cannot consider this statement for the truth of the matter asserted.

amounted to an official policy of retaliation.  Even viewing all the different types of actions together,  a handful of other incidents over the course of two years does not come close to the level of pervasive, ongoing conduct that was found to constitute a custom for *Monell* purposes in *Griffin*, 261 F.3d at 1308, or *Perez*, 168 F. App'x at 340-41.  The incidents Plaintiff identifies were neither pervasive nor widespread.  Despite considering the evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendant maintained a policy of retaliating against critical citizens through the adverse actions Plaintiff alleges he experienced.  Accordingly, Plaintiff has failed to establish municipal liability for his First Amendment retaliation claim against the town of Howey-in-the-Hills.  Defendant is entitled to summary judgment as to Count II.

## IV.    CONCLUSION

As no genuine issues of material fact exist, Defendant is entitled to summary judgment in its favor as to Counts I and II.  Accordingly, it is **ORDERED**:

1. Defendant's Motion for Summary Judgment (Doc. 89) is **GRANTED.**

2. The Clerk is directed to enter judgment in favor of Defendant, terminate any pending motions, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on March 22, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
Counsel of Record; Unrepresented Parties (if any)

41